21. Please let me know the best way to contact you by; address, phone, fax, office, cell, and e-mail address.

22. Do you know any other dentists I can speak with that have had dealings with Mr. Letterese? Let me know if I should contact them with or without reference to you.

05/24/2005

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / SIMONTON

PETER LETTERESE AND                                    )
ASSOCIATES, INC.,                                      )
a Florida corporation,                                 )
                                                       )
            Plaintiff,                                 )
                                                       )
    vs.                                                )
                                                       )
WORLD INSTITUTE OF SCIENTOLOGY                         )
ENTERPRISES INTERNATIONAL, INC., RELIGIOUS             )
TECHNOLOGY CENTER, INC., CHURCH OF                     )
SCIENTOLOGY INTERNATIONAL, INC., and BRIDGE            )
PUBLICATIONS INCORPORATED, all California              )
corporations, CHURCH OF SCIENTOLOGY FLAG               )
SERVICE ORGANIZATION, a Florida corporation, NEW       )
ERA PUBLICATIONS INTERNATIONAL, a foreign              )
corporation, CHURCH OF SCIENTOLOGY, MISSION            )
OF FORT LAUDERDALE, INC., AND CHURCH OF                )
SCIENTOLOGY OF FLORIDA, both Florida corporations, )
and DOES 1-3200,                                       )
                                                       )
            Defendants.                                )

## AFFIDAVIT OF MAUREEN O. CALVISI

BEFORE ME the undersigned official appeared MAUREEN O. CALVISI who,

being duly sworn, deposes and says:

1.      I am the office manager in a private practice dental office called

Thomas J. Karas, DDS. I have personal knowledge of the facts stated in this Affidavit,

and if called as a witness, I could and would competently testify to the statements made

herein, except where statements are specifically identified as being made on information

and belief, and if so, such statements are believed to be true based on such.

2. I am the Office Manager for Dr. Thomas J. Karas, DDS who is a client of Galileo® consulting, which provides consulting to Dr. Karas' dental office in management of the practice.

3. In late January 2005 or early February 2005. Our office received a phone call from an unknown caller. The caller said that he represented a "newsletter" and he wanted to do a 15-minute interview with Dr. Karas. He said he wanted to know about dental consulting companies and asked if Dr. Karas was satisfied with the consulting company that he was with. When I told him Dr. Karas could not come to the phone he said he would call back. He called back later that day and asked again to speak to Dr. Karas. I told him Dr. Karas could not come to the phone but he was happy with the dental consulting company. The unknown caller did not call back.

FURTHER AFFIANT SAYETH NOT

*Maureen Q. Calcusi*

[First name Middle initial Last name]

STATE OF *MICHIGAN*
COUNTY OF *OAKLAND*

SWORN TO AND SUBSCRIBED
BEFORE ME,
the _24th_ day of _MAY_ 2005

Notary Public

My Commission
Expires: _7-8-2007_

*SIGNED AND NOTARIZED IN*
*MACOMB COUNTY, MICHIGAN*



MICHAEL L. HARVILL
NOTARY PUBLIC
OAKLAND COUNTY MICHIGAN
My Comm. Expires July 8, 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / SIMONTON

PETER LETTERESE AND                                          )
ASSOCIATES, INC.,                                            )
a Florida corporation,                                       )
                                                             )
            Plaintiff,                                       )
                                                             )
    vs.                                                      )
                                                             )
WORLD INSTITUTE OF SCIENTOLOGY                               )
ENTERPRISES INTERNATIONAL, INC., RELIGIOUS                   )
TECHNOLOGY CENTER, INC., CHURCH OF                           )
SCIENTOLOGY INTERNATIONAL, INC., and BRIDGE                  )
PUBLICATIONS INCORPORATED, all California                    )
corporations, CHURCH OF SCIENTOLOGY FLAG                     )
SERVICE ORGANIZATION, a Florida corporation, NEW            )
ERA PUBLICATIONS INTERNATIONAL, a foreign                   )
corporation, CHURCH OF SCIENTOLOGY, MISSION                  )
OF FORT LAUDERDALE, INC., AND CHURCH OF                     )
SCIENTOLOGY OF FLORIDA, both Florida corporations, )
and DOES 1-3200,                                            )
                                                             )
            Defendants.                                      )
                                                             )

# **AFFIDAVIT OF Paul Wesley Bryan DMD**

BEFORE ME the undersigned official appeared Paul Wesley Bryan DMD who,

being duly sworn, deposes and says:

1.      I am a dentist and practice under the business name of Paul W. Bryan

DMD. I have personal knowledge of the facts stated in this Affidavit, and if called as a

witness, I could and would competently testify to the statements made herein, except

where statements are specifically identified as being made on information and belief, and

if so, such statements are believed to be true based on such.

2.      I am a client of Galileo consulting, which provides consulting to my dental office in management of my practice.

3.      On or about one year ago, I received an unsolicited call from a man requesting information about Mr. Letterese.

4.      He did not identify himself but indicated that he was interested in my experience with Galileo. He indicated that he was aware of Galileo clients who were not satisfied with the service they received and that they felt that they had been manipulated by Mr. Letterese. I indicated that my experience was quite the opposite and that if he was looking more dissatisfied clients he would have to look elsewhere. . I have never received any communications like this that were so subtly negative and damaging to a persons character as these were either within the dental profession of from without.

FURTHER AFFIANT SAYETH NOT

Paul Wesley Bryan, DMD

STATE OF WASHINGTON
COUNTY OF PIERCE

SWORN TO AND SUBSCRIBED
BEFORE ME,
the 24TH day of MAY 2005

Notary Public

My Commission
Expires: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / SIMONTON

PETER LETTERESE AND )
ASSOCIATES, INC., )
a Florida corporation, )
)
       Plaintiff, )
)
vs. )
)
WORLD INSTITUTE OF SCIENTOLOGY )
ENTERPRISES INTERNATIONAL, INC., RELIGIOUS )
TECHNOLOGY CENTER, INC., CHURCH OF )
SCIENTOLOGY INTERNATIONAL, INC., and BRIDGE )
PUBLICATIONS INCORPORATED, all California )
corporations, CHURCH OF SCIENTOLOGY FLAG )
SERVICE ORGANIZATION, a Florida corporation, NEW )
ERA PUBLICATIONS INTERNATIONAL, a foreign )
corporation, CHURCH OF SCIENTOLOGY, MISSION )
OF FORT LAUDERDALE, INC., AND CHURCH OF )
SCIENTOLOGY OF FLORIDA, both Florida corporations, )
and DOES 1-3200, )
)
      Defendants. )
)

# AFFIDAVIT OF Paul Wesley Bryan DMD

BEFORE ME the undersigned official appeared Paul Wesley Bryan DMD who, being duly sworn, deposes and says:

1.      I am a dentist and practice under the business name of Paul W. Bryan DMD. I have personal knowledge of the facts stated in this Affidavit, and if called as a witness, I could and would competently testify to the statements made herein, except where statements are specifically identified as being made on information and belief, and if so, such statements are believed to be true based on such.

2.      I am a client of Galileo consulting, which provides consulting to my dental office in management of my practice.

3.      On or about the first of the year, 2005, I received an unsolicited call from a person, I believe a man, claiming to be a private investigator from Snohomish County in the State of Washington.

4.      He identified himself as a private investigator working in Snohomish County and that he was interested in my experience with Galileo. My recollection is that he was aware of a number of dissatisfied Galileo clients and that he was gathering information for a future action of some kind. I do recall specifically that he asked if I was going to inform Mr. Letterese of this conversation. When I responded with "probably" he laughed. I have never received any communications like this that were so subtly negative and damaging to a persons character as these were either within the dental profession of from without.

FURTHER AFFIANT SAYETH NOT.

Paul Wesley Bryan DMD

STATE OF WASHINGTON
COUNTY OF PIERCE

SWORN TO AND SUBSCRIBED
BEFORE ME,
the 24TH day of MAY 2005

Notary Public

My Commission
Expires: Oct 14 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 04-61178-CIV-HUCK / SIMONTON

PETER LETTERESE AND                                    )
ASSOCIATES, INC.,                                      )
a Florida corporation,                                 )
                                                       )
            Plaintiff,                                 )
                                                       )
    vs.                                                )
                                                       )
WORLD INSTITUTE OF SCIENTOLOGY                         )
ENTERPRISES INTERNATIONAL, INC., RELIGIOUS             )
TECHNOLOGY CENTER, INC., CHURCH OF                     )
SCIENTOLOGY INTERNATIONAL, INC., and BRIDGE            )
PUBLICATIONS INCORPORATED, all California              )
corporations, CHURCH OF SCIENTOLOGY FLAG               )
SERVICE ORGANIZATION, a Florida corporation, NEW       )
ERA PUBLICATIONS INTERNATIONAL, a foreign              )
corporation, CHURCH OF SCIENTOLOGY, MISSION            )
OF FORT LAUDERDALE, INC., AND CHURCH OF                )
SCIENTOLOGY OF FLORIDA, both Florida corporations,     )
and DOES 1-3200,                                       )
                                                       )
            Defendants.                                )
                                                       )

# **AFFIDAVIT OF Paul Wesley Bryan DMD**

BEFORE ME the undersigned official appeared Paul Wesley Bryan DMD who,
being duly sworn, deposes and says:

1.      I am a dentist and practice under the business name of Paul W. Bryan
DMD. I have personal knowledge of the facts stated in this Affidavit, and if called as a
witness, I could and would competently testify to the statements made herein, except
where statements are specifically identified as being made on information and belief, and
if so, such statements are believed to be true based on such.

2. I am a client of Galileo consulting, which provides consulting to my dental office in management of my practice.

3. On or about two years ago I began receiving unsolicited e mails regarding Mr. Letterese. The e-mails were not sent from an address with which I was familiar. The were not signed or noted in anyway that would indicate to me from whom they came.

4. The body of the e-mails were very critical of Mr. Letterese. One included what appeared to be a police report regarding child molestation with police identification photo. Another was a description of a lawsuit filed by an individual against Mr. Letterese and the Church of Scientology. There were others, perhaps as many as 8, but I do not recall their specifics other than that they were of a very negative nature regarding Mr. Letterese and did not reflect my experience with him nor his character. I have never received any documents like this that were so negative and damaging to a persons character as these were either within the dental profession of from without. They were so without merit that I deleted them form my computer.

5. FURTHER AFFIANT SAYETH NOT

Paul Wesley Bryan DMD

STATE OF WASHINGTON
COUNTY OF PIERCE

SWORN TO AND SUBSCRIBED
BEFORE ME,
the 24TH day of MAY 2005

Notary Public

My Commission
Expires: Oct /16 2006

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing AFFIDAVIT OF PAUL WESLEY BRYAN, DDS was caused to be served by facsimile on May 25, 2005 on the following counsel at the addresses as follows:

Helena K. Kobrin
Moxon & Kobrin
3055 Wilshire Blvd., Suite 900
Los Angeles, CA 90010
Fax: (213) 487-5385
*Attorneys for Defendants World Institute of Scientology Enterprises International, Inc., Bridge Publications, Inc., Church of Scientology Flag Service Organization, Church of Scientology Mission of Fort Lauderdale, Inc., Church of Scientology International, Inc. and Church of Scientology of Florida, and Scientology Missions International, Inc.*

Thomas Meeks
Zuckerman Spaeder LLP
201 South Biscayne Blvd., Suite 900
Miami, FL 33131
Fax: (305) 579-9749
*Attorneys for Defendants World Institute of Scientology Enterprises International, Inc., Bridge Publications, Inc., Church of Scientology Flag Service Organization, Church of Scientology Mission of Fort Lauderdale, Inc., and Church of Scientology of Florida, Church of Scientology International, Inc., and Scientology Missions International, Inc.*

Michael Nachwalter, Esq. and Elizabeth B. Honkonen, Esq.
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131-4327
Fax: (305) 372-1861
*Attorneys for Defendant Religious Technology Center, Inc.*

On May 25, 2005.

_____/s/ David L. Hoffman_____
David L. Hoffman
Adm Pro Hac Vice Nov.18, 2004

LAW OFFICES OF DAVID L. HOFFMAN
27023 McBean Parkway, Ste. 422
Valencia, CA 91355
Tel: (661) 775-0300

- 1 -

Fax:  (661) 259-1255

171 of 262

the village

# VOICE

## News

SIREN 2008 MUSIC FESTIVAL · Saturday, July 19th, at Coney Island, NY

**Village Voice Insiders**

- **Weekly villagevoice.com**
- **Weekly freebies and Special Offers**
- **Daily "What To Do in NYC" E-mail**
- **Information on the Performing Arts**

Subscribe

E-Mail Address    [Go]

## VOICE Free New York Classifieds

| buy, sell, trade | 3,451 | musician | 2,754 |
|---|---|---|---|
| rentals | 18,833 | jobs | 5,790 |
| adult | 9,638 | | |
| entertainment | | | |

classifieds | backpage.com | Post ads for free!

### Daily Voice »

Runnin' Scared

Voice Choice: Neal Medlyn's Unpronounceable Symbol
by Angela Ashman (9:09AM 07/09)

Clip Job: A Week of Musicals
by Tony Ortega (8:00AM 07/09)

Global Warming May Ruin NY's Super Delicious Tap Water. Report
by Michael Clancy (2:26PM 07/08)

La Daily Musto

Lez Get Together, Yeah-Yeah-Yeah!
by Michael Musto (3:40PM 07/08)

A Plea For Some Verbal Floral Displays
by Michael Musto (3:30PM 07/04)

The Worst Movie Ever Made Needs Your Help
by Michael Musto (1:32PM 07/03)

Fork in the Road

Our Man Sietsema and the World's Most Perfect Minced Meat

---

write to the editor | email a friend | print article | comment

News

## Scientology's Crushing Defeat

A previously unpublished saga of an $8 million check

**By Tony Ortega**
Tuesday, June 6 2008

Six years ago, when I was a reporter at New Times LA, Id written several stories about Scientology (Los Angeles is one of its headquarters), and I was about to uncork the longest one yeta 7,000 word piece about an embarrassing, $8 million defeat Scientology had just suffered, when the weekly paper suddenly folded.

That unpublished story has been sitting in storage ever since. Fast forward to 2008, and the world of reporting on Scientology has changed radically, thanks in part to the lunacy of Tom Cruise, but also in part to a worldwide, leaderless movement that calls itself Anonymous. Ravenous for any information about L. Ron Hubbards strange organization, Anonymous scours the world for the least tidbit



Scientology leader David Miscavige, in full Sea Org regalia. Miscavige's status as "captain" of the Sea Org was central to a court case that resulted in the largest court penalty in Scientology history.

by Sarah DiGregorio
(8:40AM 07/09)

Fork in the Road
Reviews Persimmon
by Sarah DiGregorio
(8:13AM 07/09)

Sound of the City

Go to the Shudder to
Think Reunion
by Rob Harvilla (2:32PM 07/08)

5 Questions for DJ
Bitman
by Araceli Cruz (1:00PM 07/08)

All City

Cluckatron Has a
Prediction
by Camille Dodero
(4:41PM 02/01)

Thraxster

Yes We Can: Obama
Pride, Through Kicks
by Nina Lalli (1:17PM 02/29)

» more blogs

---

*about Scientology.*

*Well, here was a pretty meaty morsel just sitting in my hard drive. Its still a substantial bit of reporting, and it fills in some gaps in the historical record of one of the most humiliating court losses Scientology has ever suffered.*

*Originally scheduled to be printed in October 2002, the piece follows. (Its unchanged except for updates in*

*[brackets].) This material may come as a revelation to some readers, but even for the know-it-alls at* Anonymous, *there are juicy bites. —*

*Tony Ortega*

**What Scientology Paid $8 Million To Hide**

**With an hour to spare, Hubbard's minions settle a debt they vowed never to pay**

*(Prepared for publication in October, 2002) by Tony Ortega*

**Even before it started,** the 1986 trial of *Lawrence Wollersheim v. the Church of Scientology of California* caused a mob scene at L.A.s downtown superior court.

When a judge decided during pretrial motions that documents describing confidential Scientology beliefs should be put in a file open to the public, 1,500 Scientologists swamped the court clerks office to keep anyone else from requesting them. The next day, the judge resealed those records. But an *L.A. Times* reporter managed to get past the crush of Scientologists and copy the file. Newspapers around the country had a field day with what the *Times* reported: the documents showed that high-level Scientologists are taught that each human contains the souls of alien creatures banished to Earth 75 million years ago by

---

Scientology's Crushing Defeat

A previously unpublished saga of an $8 million check
The Houses That Ruthlessness Built

Welcome to middling baseball in sleek new cathedrals

Trash Talking with Harvey Weinstein

Juicy details plucked from the garbage of a movie mogul

Columbia's Knotty Noose Problem

There's still no culprit for a notorious noose at Teachers College—but plenty of evidence behind the firing of Madonna Constantine

Rap's 2008, Beyond Lil Wayne

Praising outstanding new hip-hop records sadly subsumed by Weezymania

---

**Backpage.com**

Maltese Puppies for Sale
Brooklyn New York

Unique, OOAK Jewelery

Hot Tub or Spa Part – Find Sales on Hot Tubs Spas – NationWide Sales

GL-8XL Cell Phone Watch
- Must have

More buy, sell, trade ads

---

**Personal of the Day**



**deseonyc**

In my bedroom, you'll find: "My bed, candles and a new sexy art piece."

**More Personals >>**

a galactic overlord named Xenu,

Scientologys process of dianetics, developed by science fiction writer L. Ron Hubbard over a period beginning in the late 1940s, was supposed to rid the body of those alien creatures.

But Lawrence Wollersheim, who had defected from Scientology after serving 11 years and making about $50,000 in payments, claimed that the organizations pricey rituals instead had made him insane and drove him to the brink of suicide. He filed suit in 1980, and six years later his trial was a sensation. Still the most expensive civil trial in L.A. court history, [This was true even in 2002, post-SimpsonT.O.] it made headlines almost daily in the spring and summer of 1986 as Scientologists jammed the courtroom and protested outside of it, complaining that their religious freedoms were being trampled on. For many in the public, reports of the trial gave them their first detailed description of Scientology, which today counts celebrities as John Travolta and Tom Cruise among its members. Travolta himself made a visit to the trial that May which was widely reported.

In the lawsuit, Wollersheim claimed that after he left Scientology in 1979 the organization retaliated by destroying his business and attempting to destroy him. In five months of testimony, Wollersheim, his psychologist, and former Scientologists described the coercion he was subjected to, sacrifices he was expected to make, and bizarre teachings he was fed, which made Hubbards outfit sound more like a mind control cabal out of *The Manchurian Candidate* than the mainstream faith it claimed to be. Scientologys attorneys countered that Wollersheim had come to the organization with a preexisting mental condition and was a drug user. Wollersheim was seeking $25 million in damages.

The jury awarded him $30 million.

It was a stunning blow to Scientology, but probably the most lasting impression that many took from the trial was the reaction of Scientologists themselves, who continued to protest at the courthouse day after day for more than a month after the verdict. Staging their demonstrations from a tent city set up across the street, the members wore pins made from ten cent coins and chanted over and over: Not one thin dime for Wollersheim!

It was a vow that Scientology kept for 16 years.

In 1989, an appellate court upheld the verdict but reduced Wollersheims award to $2.5 million. But even before the original trial started, and for years afterward, various

Scientology entities hit Wollersheim with other lawsuits, exhausted every possible appeal, filed mountainous legal briefs, claimed that the particular entity he had sued was broke and could never pay him, and found other ways to put off paying the money.

Even after the case had twice been to the U.S. Supreme Court and the last possible appeal had been denied, Scientology seemed determined that it would never go back on its promise to deny Wollersheim even one thin dime.

And then, suddenly, Scientology threw in the towel.

---

On May 9 **[2002]**, the Church of Scientology of California, an entity which had once been considered the mother church but for a decade was supposed to have been dormant and broke, submitted a check to the superior court for $8,674,843 to cover the $2.5 million judgment and the interest it had accrued.

A Scientology spokeswoman says that the organization was simply tired of the case.

But the timing of the payment suggested another reason.

The very morning that Scientology paid to end the case, superior court judge Robert L. Hess was scheduled to begin a new hearing in the 22-year-old casea hearing Wollersheims attorneys had been preparing for, and demanding, for years.

Wollersheims attorneys were about to present evidence that they believed would not only show how Scientology had juggled assets to avoid paying Wollersheim in the past, but would also convince Hess that Scientology's complex corporate structure itself was an elaborate sham. Contrary to what it had assured the IRS when it regained its tax exempt status in 1993, the church and its affiliated organizations, Wollersheims attorneys assert, was really a dictatorship with power centered in one man, Hubbards successor David Miscavige, who had directed all of the litigation against Wollersheim and had ordered documents key to the case altered or destroyed.

Scientology's attorneys had managed to keep Miscavige out of the proceedings, but the organization's nominal president, Heber Jentzsch, was facing cross examination by Wollersheims attorneys if the hearing came off as planned.

In the final days before the scheduled event, Scientology attorneys continued to argue for delays and outright dismissals, but Hess denied them and would not budge on the May 9 date. After inheriting the case three years earlier, Hess, in transcripts, appeared determined to turn over his courtroom to a live hearing.

Scientology's $8.7 million check arrived just an hour before the proceeding was scheduled to begin.

In the months since, the court has gradually released the money to Wollersheim for him to dole out to numerous attorneys to pay for years of service. Those fees will eat up much of the money, but Wollersheim expects to end up with between $1 to $2 million of it. **[That hasnt turned out to be the casesee the update at the end of the piece.]**

He is fond of noting that thats a lot of dimes.

His attorneys are relieved that their client has finally received the money he had won 16 years earlier, but they admit to disappointment that the evidence they collected for so many years was never presented to the public in a live court drama.

They were happy, however, to share it with *New Times*. **[And now, the *Voice*.]**

---

**A central contention in Wollersheims case** was that even sixteen years after Hubbards death, his writings provided an unalterable blueprint to how the organization of Scientology really operated.

And to understand what happened to Wollersheim and others who have defected and now regret the time and large sums they spent learning about Xenu and other dubious concepts, they say, you have to have a working knowledge of Hubbards jargon and policies.

Wollersheim got his first taste of it while walking on a street in San Francisco in 1969. He had grown up in Milwaukee and was attending the University of Wisconsin at Madison when he took a summer trip to California. A young woman approached him and made him a pitch, telling him that she had something hed like to see.

Youre 18. You think youre going to get lucky, Wollersheim says in a telephone interview

from an undisclosed location.

Today hes 51, and he spends much of his time in Nevada and Utah. But the telephone number he provided *New Times* suggested that he was in Colorado this day. He claims that even after collecting his award, and more than 23 years after leaving the Church of Scientology, he still must be careful about his personal security by staying on the move. **[Six years later, hes still cagey. I spoke to him on the phone the other dayhe was in Nevada.]**

That day in 1969, Wollersheim followed the young woman to an office and she handed him over to other Scientologists, who asked him to take a personality test. It seemed innocent enough, but later he ended up convincing many others to do the same thing. No matter how you answer the test, he says, they tell you youre screwed up and that they can fix you.

He was soon hooked. I decided to quit school, make a bunch of money, and pay them to get all these secret levels of ability. New recruits are told that advancement in the religion can bring them all sorts of benefitshigh level members are said to experience raised IQs, clairvoyance, an immunity to disease, and are able to leave their bodies.

Scientologists believe they can attain these abilities through a process called auditing, which enables them to remove engrams from their reactive mind, something akin to talking away the scars left over from lifes traumas. When all of those scars are removed, a Scientologist is said to be a clear, and can attain amazing powers. Like other low-level Scientologists, Wollersheim was kept in the dark about much of Scientologys true core beliefs. Only through attaining far more experience and going through increasingly expensive auditing could he hope to go clear.

He found himself making good money, however, and he gave nearly all of it to Scientology, which attracted the attention of a recruiter for the Sea Organization, an elite order of followers that originated on a ship with Hubbard in the 1960s. Wollersheim was convinced to join the Sea Org, and he signed its standard billion-year contract, agreeing to come back, lifetime after lifetime, to serve Hubbard and Scientology. He was told to sell his candle business and come to Los Angeles where he would be more useful.

Wollersheim continued to excel, and was eventually made a supervisor at the Celebrity Centre on 6th Street. (Today the Centre inhabits a historic building on Franklin Street.) Put

in charge of 15 employees, Wollersheim found himself responsible for attracting new celebrities to the religion.

They have a belief that if they control Hollywood, they will be able to create a mass recruiting phenomena, he says. Finding new celebrity recruits was a serious endeavor, and required lots of planning and research, sometimes with the use of private investigators. Wed develop a battle plan and rehearse drills of how we were going to surprise the celebrity, he says, often making use of actors they had already attracted to the religion.

If we needed them for bait for another celebrity, wed go with them to an event. Karen Black, for example, would bring over someone to us, and wed already have rehearsed a pitch for that person. Actors on the declining side of their careers made easier targets, Wollersheim says. Wed invite them to a very controlled event without the public present. Movie premieres were our best bets.

---

Still, with all of their preparations, they failed nearly all of the time. Even at that time, the mid 1970s, the word was out that Scientology was weird.

Wollersheim remembers his staff targeting Richard Kiel, the tall actor who played Jaws in the James Bond movies. They worked on that guy 50 different ways. I worked on him myself, trying to get him in. Kiel suffered chronic pain, and he was promised that Scientology could make it go away. We worked on him and worked on him, but he gave it up. We had him in the communication course...but we never got the big win.

As a Sea Org member working at the Celebrity Center, Wollersheim was paid $18 for a six day work week, and was supplied food and meager lodgings, and all the while paid for his own auditing, which was becoming more and more expensive. But if the organizations stats were downif the numbers of new recruits or money taken in for auditing or other criteria that were measured weekly had dippedthen a Sea Org members food and pay was cut, Wollersheim says. You found a way to get them their cash. You didnt give a damn, after a while, what you told other peopleor the bankto get your money to the org. It was a continual crisis. And it was a calculated thing. It was Orwellian. You had to have a constant crisis to keep people in fear. If it wasnt that the money was down, then it was that the inspectors were coming. It was like living in a gulag in a free country, and the bars existed in your own head.

Wollersheim says the threat of retaliation kept him from bailing out. It was known among Scientologists that defectors were hit with large bills for services they had received at discounted pricescalled freeloader debtand could also find themselves the target of aggressive private investigations and legal action, a policy Hubbard had called fair game.

Wollersheim feared leaving the religion more than he did staying in.

As youre going through it, youre told this is the secret of the universe. You hear legends about results that other people are getting. Many people are telling you about their euphorias. After hundreds and hundreds of hours of training, you have no questioning, critical mind left at that point. Theres no concept in your mind that it couldnt be true. You are so far gone by that point.

And thats when Wollersheim learned the secrets of OT III.

Hubbard claimed that he had nearly paid with his life learning the revelations of OT III, the third level of materials that Scientologists must master after going clear and becoming an operating thetan, or OT. The information in OT III was so explosive, Hubbard said, he believed its secrets must have been designed to kill anyone who discovered it. The danger those secrets posed to the uninitiated was one of the ways Scientologists justified not telling newer members about them. (Today they are available on the Internet for perusal, if you know where to look. This reporter suffered no ill effects from reading them.) Former members say that today the typical Scientologist must spend several years and about $100,000 in auditing before they find out on OT III that they are filled with alien souls that must be removed by further, even more expensive auditing.

OT III totally shatters the core sense of identity. The central concept of mind control is attacking the core personality, the threat that you are not who you think you are. At OT III, you find out that youre really thousands of individual beings struggling for control of your body. Aliens left over from space wars that are giving you cancer or making you crazy or making you impotent. The reason for every bad thing in your life is these alien beings, Wollersheim says. I went psychotic on OT III. I lost a sense of who I was.

Years can be spent removing these alienscalled body thetans or BTsby talking to and about these supposed hitchhiking entities while holding onto a device called an e-meter. Youre talking to thousands of beings. They have histories. And anger. Theyre complex

personalities. I started drinking heavily to drown out the voices. I was non-functional, irrational, filthy. I wandered the streets of L.A. for three days. Finally I came enough to my senses to get in touch with Scientologists I knew. He was cleaned up and calmed down, but Wollersheim was told that the solution to his troubles was just more auditing.

He now sold art to businesses, and employed 132 people in seven different cities. Nearly all of his employees were Scientologists, and so were nearly all of his clients.

Wollersheim says he paid $28,000 for classes in Clearwater, Florida that were supposed to help him locate alien beings that had been a part of him during past lives. It induced another psychotic episode. I went so raving nuts, I tore down a fence at the center. I thought I was an alien warlord who couldn't be stopped. After about a day and a half, they came and got me.

Eventually, however, Wollersheim graduated to a level where he believed he had finally eradicated all of the thetans from his body. You think youve made it. Youre free of all these beings. But then Hubbard releases the second big secret [on a level called New Era Dianetics for Operation Thetans, also called NED for OTs or NOTs.] He tells you there are far more of these beings than anyone ever dreamed of. Inside those original thetans are clusters of other beings. Beings that are eight feet from you, floating near you all the time. Beings miles away from you that are still connected with you. Beings in the television, and youre told that watching television will wake them up, so youre told not to watch TV. If OT III made some people nuts, NOTs really drove them over the edge, he says.

While auditing NOTs, Wollersheim had his third psychotic break. Back in Los Angeles, he remembers lying in a dark room with a .45 revolver, thinking about killing himself. A friend discovered him and took him to a Scientology center for more auditing. Once again, he went back to Clearwater. But when his friend saw that it wasnt helping him, she told him to get away.

Those were the magic words, he says. He decided to leave. Word traveled quickly, however, that Wollersheim was going to leave Scientology after 11 years.

At a restaurant in Clearwater, he says, he was approached by a member of the Guardians Office, Scientologys intelligence bureau. He looked at me and said, Dont you ever tell a doctor, lawyer or priest anything that ever happened to you in Scientology.

The organization then declared Wollersheim a suppressive person (or SP) in other words, an enemy of Scientology and commanded other Scientologists to disconnect from him, he says. His customers stopped paying bills, and 80 percent of his employees quit their jobs within three days. Weeks later, his business had collapsed, leaving him with hundreds of thousands of dollars in debts and no way to pay them.

For several months, Wollersheim went into hiding, worried that harm would come to him. Youre told in Scientology that if you reveal their secrets, bad things will happen to you, he says. His parents, however, were thrilled that he was out, and they gave him some money to live on.

---

At some point in that six months I realized that something bad had happened to me, and I needed someone elses perspective. He returned to Los Angeles, looking for others who had left Scientology. On a hunch, he went to the downtown superior court and asked to see the names of people who were suing Scientology. I was shocked to find a whole list of people, he says. Some he recognized. He decided to call the attorney handling their cases.

**The churchs conduct was manifestly outrageous,** the California court of appeals wrote a decade later, in 1989, after Wollersheims trial had resulted in a $30 million award. (Despite its affirmation of the lower courts ruling, however, the appeals court lowered the award to $2.5 million, citing Scientologys supposed meager financial state.)

Scientology claimed that its practices were protected by freedoms guaranteed in the First Amendment, but the court rejected that argument by pointing out that Wollersheim had been coerced to remain a Scientologist through the threat of freeloader debt, the use of fair game, and the use of confidential information in his files.

The opinion by the appellate court remains one of the most damning in a long history of court denouncements of Scientology which have occurred worldwide.

The Wollersheim case is among the most important decisions against Scientology in its history because it showed that the organizations standard practices used against a member were harmful, says Stephen Kent, a sociologist of religion at the University of Alberta who is one of the few academics who studies Scientology in depth.

Frank Oliver, a former Scientologist who once gathered information on perceived enemies

as part of Scientology's current intelligence wing, the Office of Special Affairs, explains why the decision was so repugnant to the organization, and why paying even a cent of it would be considered by Scientologists a horrendous defeat: **Scientology's entire premise is that the Hubbard technology is infallible, he says. The underlying concept of the Wollersheim judgment is that the Hubbard tech is harmful. If they pay, they validate the argument that the tech is toxic.**

And for that reason, Oliver and other former Scientologists say, Scientology was willing to spend vast amounts of money in legal costs to avoid paying Wollersheim.

Even before the trial had started, Scientology had begun a long campaign of separate lawsuits, court motions and other tactics meant to derail the case.

**In 1995, Scientologists filed a separate lawsuit based on federal anti-racketeering laws (a RICO action) in U.S. district court against Wollersheim, his attorneys, and his expert witnesses.** The suit claimed that, in essence, Wollersheim's attempts to wrestle documents out of Scientology for his trial was akin to a criminal enterprise.

The federal court threw out the lawsuit (dubbed Wollersheim 2), calling it frivolous and bordering on malicious.

While that suit was pending, Scientology filed another RICO action, claiming that the *entire L.A. superior court* was prejudiced against it. In an unprecedented move, the U.S. Ninth Circuit Court of Appeals not only denied the appeal when this lawsuit, Wollersheim 3, was rejected, but **even had it stricken from the courts record.**

Meanwhile, the particular entity Wollersheim had sued, the Church of Scientology of California (CSC), was mysteriously shrinking.

In 1985, the year before Wollersheim's trial, in a suit brought by another disgruntled former member in Oregon, an official for CSC claimed that it had assets of more than $350 million. **But during Wollersheim's proceedings just twelve months later, CSC officials testified that it was worth only $13 million.** (And one of Wollersheim's attorneys, Dan Stein, used CSC's own documents to show that even this amount was ephemeral. By the time Wollersheim won his verdict, CSC was essentially broke.)

Wollersheim and his attorneys suspected where the money had gone.

In 1981, a year after Wollersheim had originally filed his lawsuit, Scientology had gone through a major, and very complex, reorganization. CSC had been splintered into many separate entities, including a new mother church, the Church of Scientology International (CSI), and something called the Religious Technology Center (RTC), a sort of ecclesiastical clearinghouse which held all of the copyrights and trademarks of Hubbards religious writings and was charged with making sure other Scientology entities kept Hubbards tech pure.

It was RTC and CSI that had brought the Wollersheim 2 and Wollersheim 3 actions, the frivolous lawsuits that had been aimed at derailing Wollersheims original suit against CSC.

Wollersheim has long argued that to avoid paying him, Scientology effected its highly complex reorganization, gutted CSC, and moved its assets to other entities such as RTC and CSI, which in turn used their financial muscle to go after Wollersheim in other actions.

And in 1997, he got proof that his theory was correct. The supposedly dormant CSC had filed yet another lawsuit against Wollersheim (eventually dubbed Wollersheim 4), but after Wollersheim successfully defeated it with a SLAPP motiona California legal strategy that defendants can use to have frivolous lawsuits thrown out of court and be awarded attorneys feesCSI admitted that it, not CSC, was really behind the action and paid Wollersheims lawyers nearly $500,000.

My client believes that it doesnt have a leg to stand on in terms of we are responsible for this amount of money owed and we are going to pay it, CSIs attorney Samuel Abelson said in court, an admission that the new organization, CSI, was really behind a lawsuit filed by the old one, CSC.

Wollersheims attorneys explain that it was nice to get the attorneys fees they had coming in the SLAPP action. But more importantly, they say, the victory provided a blueprint for how Wollersheim should seek his original court judgment.

They spent the next five yearsuntil this past May [2002]trying to prove that the alphabet soup of CSI, RTC, and CSC was a sham, and that Scientology, under whatever name, should have to pay the $2.5 million plus interest that Wollersheim had won in his 1986 trial

with CSC.

They gathered evidence to show that despite the confusing profusion of names and acronyms, Scientology was really a single enterprise, and its actions and litigation were directed by one man, Hubbards successor David Miscavige. Former high-ranking officials declared that they had witnessed Miscavigewho supposedly had no position or standing at the time with CSC, the corporation being sueddirecting the litigation against Wollersheim and ordering the destruction of key evidence in the case. Special intelligence operations, they declared, were formed to target not only Wollersheim and his attorneys but even the judge, witnesses, and their family and friends. When the jury awarded Wollersheim $30 million, one former official testified, Miscavige vowed that it would never be paid, even if it cost more than $30 million to avoid it. CSC, meanwhile, was purposely ransacked of all assets to make sure that Wollersheim couldnt reach it, two former officers declared.

One of the most damning accounts came from one of Scientologys own attorneys, a man named Joseph Yanny, who was hired in 1984 and left in disgust three years later. In his court declaration, Yanny testified that the lead Scientology attorney in the Wollersheim case, Earle Cooley, had personally ordered the destruction of evidence relating to Cult litigation in my presence. Yanny also witnessed the gathering of information from parishioners confidential files for use by the legal team. He was told that using such confidential files to prepare for court was standard practice. And Yanny also was present when a blackmail campaign was planned against Wollersheims original attorney, Charles OReilly. The medical records of OReilly were to be stolen from the Betty Ford Center and another location in Santa Barbara, to show that he was using cocaine, discredit him, and possibly blackmail him into easing off on his 30 million dollar verdict now on appeal. I objected to this as illegal and an alternative plan was quickly arrived at to settle my nerves.

These declarations and other documents, Wollersheims attorney say, painted a clear picture: the jumble of organizationsCSC, RTC, CSI and many, many othersmeant little when it came to defending Scientology against claims that its technology was harmful. Miscavige, they claimed, was in firm control, which ignored corporate and legal niceties.

If it had been shown in court that the 350 organizations of the church of Scientology were all controlled by David Miscavige, it doesnt look like a legitimate religion but the authoritative cult that it is. It would have been terrible public relations, and they still would

have had to pay the money. And that's why they paid the money when they did, to avoid the bad PR, says longtime Wollersheim attorney Ford Greene.

But Dan Leipold, another Wollersheim lawyer, says that Scientology had even more to worry about than bad PR from the documents and testimony they had gathered.

I think all of the evidence could have threatened the church of scientology's tax exempt status, he says.

**Hubbard organized Scientology as a religion in 1954.** But in 1967, it was stripped of its tax exempt status by the IRS. For the next 25 years, the U.S. government repeatedly turned down Scientology's appeals to regain its exemption on the grounds that Scientology was not so much a religion as a money-making venture benefiting one man, Hubbard.

Scientology retaliated in an extraordinary way. With Hubbard's knowledge and direction, agents of his intelligence unit, the Guardians Office, began infiltrating IRS and other government offices in the mid 1970s. Dubbed Operation Snow White by Hubbard, the illegal operation netted stolen government documents by the yard, and went undiscovered until a 1977 raid of Scientology offices by the FBI. Eleven Scientologists, including Hubbard's wife Mary Sue, were sentenced to prison. Hubbard himself was named an unindicted co-conspirator.

Scientology subsequently disbanded the Guardians Office, claiming that it was a rogue outfit. But its war with the IRS did not stop.

Even after Hubbard's death in 1986, the IRS continued to deny the organization tax-exempt status, and Scientology fought back by siccing personal investigators on individual IRS employees and filing more than 2,000 separate lawsuits against the agency.

Despite the harassment, however, the IRS continued to win victories against Scientology in court. In 1992, A United States Claims Court upheld the IRS denial, citing the commercial character of much of Scientology and its scripturally based hostility to taxation. Tax exempt organizations, the claims court wrote, simply do not exhibit the financial complexity or the phenomenal preoccupation with money displayed by Scientology's management churches and organizers.

By then, however, the IRS had already, secretly, caved. In 1991, under the first George Bush presidency, the IRS had reversed itself and began a process that wasn't made public until 1993, under the Clinton administration, when the IRS revealed that it was giving nearly every Scientology entity the tax exempt status it coveted.

It was a stunning turnaround and one that, **[more than]** a decade later, still has tax experts shaking their heads.

Former IRS exempt organizations specialist and tax journalist Paul Streckfus says that the IRS simply cracked from the pressure Scientology had been applying for so many years.

The IRS found that Scientology was more than they could handle, Streckfus says. We think of the IRS as so powerful, but by 1991, the commissioner of the time, Fred Goldberg, decided that the case was tying up the IRS. Scientology seemed to have limitless money, so I think Goldberg decided he wanted to get rid of the case and to hell with it. He directed his people to get the best deal that they could.

Miscavige, announcing the victory to his flock at a gathering in Los Angeles, bragged that in 1991 he had simply dropped by the IRS headquarters and, without an appointment, asked to speak to Goldberg. (After this was first reported, Scientology took out a full-page ad in the *New York Times* denying that Miscavige had said it.) Soon after the impromptu meeting, Goldberg established a special committee to examine the Scientology casesa move that tax experts say all but assured that the exemptions would eventually be awarded. In court testimony, IRS officials have admitted that during the process of granting the exemptions, they were instructed not to look into Scientologys business-like ventures. The final agreement called for Scientology to pay $12.5 million.

To them, it was a pittance, Streckfus says.

Goldberg has refused to discuss the matter since he left the IRS. A New York Times analysis of the affair estimated that Scientology saved tens of millions of dollars in taxes.

The war is OVER! Miscavige said in his Los Angeles speech, and at one point referred to a billion dollar tax bill that Scientology would not have to pay.

Its a sad commentary, says Streckfus about the IRS cave-in. You or I would have been sent up the river. But if you have enough resources, you can beat off the IRS.

The IRS no longer describes Scientology as a money-making dictatorship headed by one man, but a religion which contains many separate, legally distinct entities, each with its own board of directors and corporate officers.

---

For tax reasons, in other words, it is important for Scientology that David Miscavige, Hubbard's successor, describe himself merely as the chairman of the board of one particular entity, RTC, and not, as Wollersheim labels him, the iron-fisted ruler of a vast empire mixing tax and non-tax exempt purposes.

They caved because we had the goods on these guys in direct contravention to their tax exempt status. Miscavige has been running the church since 1986, says Wollersheim attorney Dan Leipold. And it was one declaration in particular, penned by a dying man, that Leipold believes scared Scientology the most.

Today, Vaughn Young lives in Ohio, and is dying of cancer. But for 20 years, he was a Scientologist, worked directly with Miscavige, and at one time was Scientology's most senior public relations officer. He was an insider who understood both how Scientology worked behind the scenes, and how it presented itself to the public. He left in 1989 and has been a key figure in numerous court battles since then. [Young passed away in June, 2003.]

Vaughn gave a declaration that was unimpeachable, says Leipold. He took 80 different internal documents, and various publications from L. Ron Hubbard and official Scientology texts. He laid them out and showed how the entire organization operates outside the corporate lines of authority.

Using Scientology's own internal documents—many of which, penned by Hubbard and considered sacred, cannot be altered and must be followed to the letter—Young shows that Scientology has a rigid, paramilitary chain of command. Even non-religious entities that market themselves to the public as having no obvious tie to Scientology fall under the strict rubric. The Way to Happiness Foundation and Applied Scholastics, for example, are two organizations that market non-religious Hubbard writings to school districts and avoid mentioning a tie to Scientology. Narconon and Criminon, meanwhile, try to convince prison officials that they are effective methods for turning inmates from drugs and crime. To the non-Scientology world, Young writes, they will say they are not Scientology and try to

appear secular. But internal documents, he shows, are explicit that these organizations fall under the command of the Scientology's hierarchy.

Unique among all of Scientology's entities, however, is the Sea Organization, the naval-uniform wearing men and women who have all signed billion-year employment contracts.

Scientology's own documents show that the Sea Org is a tough, elite, tight-knit organization that has the authority to move into and take over any organization...regardless of corporate lines, Young writes. According to its own publications, the highest ranking positions in Scientology entities can only be held by Sea Org members.

Numerous documents describe Hubbard's wish that his elite Sea Org members could be sent to any Scientology organization, secular or religious, and take over on the spot, Sea Org Missions are used to cross corporate lines and to control all Scientology organizations and corporations, even into the private business sector, Young writes. Numerous documents describe Sea Org members showing up at far-flung Scientology enterprises to take control, fire executives, and obtain payment for their work.

In 1987, Miscavige signed a directive which reiterated the Sea Org's power to take control of any other Scientology entity.

But when he has been asked about the Sea Org's power, and about his rank today as the captain of the Sea Org, Miscavige plays down his role.

Miscavige has said that the Sea Org is just a fraternal religious ordersomething akin to the Jesuits in the Catholic religionand that he is only one of several Sea Org captains. The Sea Org has no legal or corporate status.

But Young argues that Scientology's own documents show that Miscavige, as captain of the Sea Org, wields ultimate power over every single Scientology entity. In a sworn document submitted to the IRS in 1991, Scientology provided a telling description of how rank works in the Sea Org, admitting that captain in the Sea Org is, for all but one person, an honorary rank. Only David Miscavige himself, the document shows, holds the true earned rank of captain, and sits alone at the top of the Sea Org's pyramid of power.

David Miscavige is, by their own sworn document, at the top of the rankings and the only

person holding a [non-honorary] rank of Captain. And this list is, according to them, the highest ranking officers in the Sea Organization, Young writes.

**Miscavige is wearing his naval Sea Org uniform** in several photographs gracing the latest copy of *International Scientology News*, a publication mailed to advanced members. Taken aboard the *Freewinds*, a cruise ship that houses Scientologists while they audit the highest levels of OT materials, Miscavige is seen handing out awards, plaques, and giving a speech of the past years stellar accomplishments and breakthroughs. **[The Freewinds is now sailing nowhere, after Caribbean officials discovered earlier this year that it was contaminated with asbestos and ordered it docked until it can be rehabilitated.]**

Theres no mention in the magazine of the Wollersheim payment among the years accomplishments or breakthroughs. Despite Scientologys $8.7 million cave, however, Miscavige may still have plenty to beam about.

Wollersheim, Leipold and others may believe that Scientology paid the $8 million to prevent a court hearing that could jeopardize its standing with the IRS, but tax experts say that its hard to believe that even the most damning evidence, as well as a definitive judges ruling, would sway the IRS to reopen an investigation of an enemy it battled for so long.

The IRS wrongly, as I believe, entered into a closing agreement with this cult, says Donald C. Alexander, a former IRS commissioner. I dont think the IRS is going to go back and unravel that closing agreement as much as it might be in the publics interest to do so.

Alexander was commissioner in the 1970s, when Hubbards agents were breaking in and stealing from government offices. His conference room was bugged and he was unnerved by 2 am phone calls on his unlisted home number. But while he was commissioner, he says, he vowed never to give in to Scientologys harassing tactics. One of my successors didnt feel that way, he says. Maybe [Fred Goldberg] actually believed this thing was a church. Stranger things have happened, but I cant think of any.

Im glad Scientology had to come up with almost $9 million. I wish it had been $90 million, he says.

*New Times* made repeated requests to speak with Miscavige and other high-ranking

members of Scientology to ask about the $8.7 million payment and why it was made. All calls were returned by a local spokesperson, Linda Hight.

The Church of Scientology of California has been trying to end this for a very long time, Hight says. They just raised the money somewhere and paid to be done with it. Asked where the money came from, Hight says she doesnt know. I dont know who put up the money. But there are millions of Scientologists in the world, and Im sure some of them would have been happy to end the whole thing. (Scientology often claims to have six million members worldwide, a number derided by critics, who put the membership much lower, usually less than 100,000. In a videotaped deposition, Scientology president Heber Jentzsch admitted several years ago that the six million number does not represent current membership but the total amount of people who have ever, since the founding in 1954, taken even a single Scientology course.)

David Chodos, attorney for the Church of Scientology International, says that the $8 million check didnt come from either CSI, RTC or the old, dormant CSC. I just handled the transaction. I didnt arrange for the funding. Funding had been made available. I dont know where it came from, really....I wasnt concerned where the money came from.

When Hight was asked about Youngs analysis of Scientology structure, Miscaviges position, and honorary versus earned rank in the Sea Organization, she replied, I cant fathom what the significance of what that would be.

Tory Christman, a former Scientologist who helped handle Scientologys PR, says that most parishioners, who avoid reading or watching the news, are probably unaware that the payment to Wollersheim has even been made.

The defeat has certainly not seemed to affect business.

---

In the most recent issue of Advance!, the magazine of the Los Angeles headquarters, Scientologists are encouraged to begin their advanced training on the OT levels after going clear. To entice them, the magazine contains stories by other Scientologists, identified only by initials, who have already attained advanced OT levels and have used their new abilities in what they call OT phenomena. One man writes of two gravel trucks bearing down on his automobile in what would have been a sure collision and his possible deathuntil, using his OT abilities, he slowed down time and made beams come out of him to hold back the

http://villagevoice.com/2008-06-24/news/Scientology-Crushing-Defeat/full (19 of 21) [7/9/2008 10:48:58 AM]

190 of 262

screeching trucks. Another Scientologist took over the body of a man who was losing control of his car on the freeway, righted the car, and calmed the driver down. Another man pacified a ghost that, unseen to others, was bothering workers in his office building.

Also in the magazine is a price list for Scientologists anxious to attain their own extraordinary OT powers. A compact disc with some of L. Ron Hubbard's lectures lists for $1,623.75. The Super Mark VII Quantum E-meter retails for $5,280.00. The OT III materials, which tell the Xenu story and reveal the alien nature of the soul, is discounted at $7,040. And packages needed for high-level solo auditing (done by oneself at home), vary from $24,222 to $63,888. **[More recently, Jason Beghe, an actor who announced in April that he had left Scientology after twelve years, revealed that he'd paid about $160,000 for a single set of procedures called L Rundowns, and over his entire career gave Scientology about a million dollars.]**

Such lavish amounts for religious instruction, Scientology's critics say, is what allows it to spend so much fighting its foes. Or offering to buy them.

Years ago, Wollersheim was offered $8 million to walk away from his judgment. They hinted they would go as high as $12 million, he says. But he refused the money. He says he had seen too many other former members accept settlements and the confidentiality agreements that came with them.

Wollersheim is glad that he turned down those offers. His judgment is the first Scientology has ever paid outright, attorneys familiar with Scientology litigation say. And now, Wollersheim hopes, his victory will encourage others to leave Miscaviges fold and expose it for what it is.

I blazed the trail, he says. Now others are going to come and turn it into a four-lane highway.

**[Six years later, Wollersheim is still fighting over the money Scientology finally paid. A woman who worked as a paralegal on his case, Leta Schlosser, sued Wollersheim (in a lawsuit named Wollersheim 6) for $5.3 million of the Scientology cash. In a trial presided over by Judge Hess, a jury awarded her $313,000, which Wollersheim says he immediately paid. But Schlosser appealed, saying she was owed more, and is asking for yet another trial. Exhausted, Wollersheim has retired from the day-to-day operation of factnet.org, an Internet**

clearinghouse for information about Scientology.

I have a good life in the sense that Im a minister. I have satisfying work. And I know that the work Ive done [fighting Scientology] will help others, he says.

As for getting his one thin dime, he says: A lot of it has gone to lawyers, its going to litigation, its going to taxes. Im working a 40-hour job. It was never about the money.

I never thought Id get paid. It took 30 years, he adds. But despite his own experience, Wollersheim encourages others who feel theyve been harmed by Scientology to pursue litigation: In almost all other cases, he says, Scientology settles. Victims of Scientology should take advantage of it and get their lives back, he says.

Scientology, meanwhile, has much bigger headaches than Larry Wollersheim these days, now that Cruises antics have helped bring a new level of media and Internet scrutiny. Scientology continues, however, to maintain its tax-exempt status.]

**Show Pages**

| More by Tony Ortega |
|---|
| |

- Trash Talking with Harvey Weinstein
  **Juicy details plucked from the garbage of a movie mogul**

- Scientology's Crushing Defeat
  **A previously unpublished saga of an $8 million check**

- Jason Beghe Turned Away at NY Scientology Building

- A Staten Island Trombonist Breaks a 64-Year Silence About a Military Race Riot
  **A violent tale of justice and injustice from America's uglier racial past**

- What to Get L. Ron Hubbard for his Birthday
  **How Anonymous has changed the game of exposing Rons ruthless global scam**

| write a comment | show/hide comments (0) |
|---|---|

home| news| music| film| arts| about| contact| store| rss| national advertising| free nyc classifieds| other vvm publications| l.i. voice

Copyright © 2008 Village Voice LLC • 36 Cooper Square • New York NY 10003

The Village Voice and Voice are registered trademarks of Village Voice Media Holdings, LLC. All rights reserved. View our privacy policy.

**GALILEO® SYSTEMS INTERNATIONAL**
**A Division of Peter Letterese & Associates, Inc.**
4919 SW 148 Ave * Davie, FL 33330
Tel: 954-434-4568 * Fax: 954-434-7152
Email: galileo@galileotraining.com



Galileo® Management
Mentoring 2002 5-Year Program™

# MANAGEMENT MENTORING 2002
# 5-Year SERVICES CONTRACT
### (Including Money-Back Guarantee)

| | |
|---|---|
| **Practice** | **NESS DENTAL PRACTICE** |
| **Address** | **1400 W. Benson Blvd., Ste 150** |
| | **Anchorage, AK 99503** |
| **Principal** | **Dr. Douglas G. Ness** |

---

# 1. Program Purpose:

Peter Letterese & Associates, Inc. (PL&A) dba Galileo®
Systems International (GSI) delivers The Galileo®
Management Mentoring Program™ to Dentists desirous
of extraordinary practice improvement. Specific to Dr.
Ness, this Management Mentoring Program will directly
increase, enhance and stabilize Dr. Ness's knowledge,
responsibility and control of the Dental Practice.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

*Flu S*

# 2. Program Orientation:

Galileo® Management Mentoring fees are non-refundable except in the case of Galileo® Systems International's complete refusal to perform simultaneously <u>accompanied by</u> non-performance by Galileo® Systems International. Galileo® Management Mentoring is not responsible for client failure to provide required cooperation or application of materials.

**This fee non-refundability clause is specially amended for Dr. Ness, but strictly according to the SPECIAL TERMS near the end of this contract document. It is herein asserted by both Dr. Ness and Galileo® Systems International that they are creating this agreement with every intention that it be <u>successfully</u> consummated and <u>not</u> result in a refund request under its exact terms, but instead result in services rendered which are considered by Dr. Ness equal to or greater in value than the fee paid. Both parties, by entering into this agreement, assert that they do so knowingly and in good faith.**

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# 3. Management Mentoring Components & Parameters ...

## Galileo® Systems International Management Mentoring For Five (5) Calendar Years Re:

**1.** Creating & Maintaining a Maximally Insurance-Independent Dental Practice
**2.** Strategic Performance-Improvement Training™
**3.** Perfect Application of The Technology of Selling®)



# 4. Client Cooperation

is required so that Galileo® Management Mentoring can obtain the best possible results in the quickest amount of time, so that no time is wasted by either side.

**Cooperation** is herein defined in intentionally simple, straightforward terms:

1) The client taking reasonable steps to clarify any and all Management Mentoring provided,

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

2) The client making reasonable efforts to follow all instructions, once clarified,

3) The client honestly communicating to Galileo® Systems International in Florida or Texas, any and all difficulties that may arise while making the effort to learn the material taught; and

4) The client attending training sessions which are scheduled to the greatest degree possible so as to not interrupt the client's work or personal schedule.

5) Galileo® Management Mentoring expects its clients to collect and forward data required in a timely manner and Dr. Ness hereby agrees to collect the data required and deliver it by fax and e-mail to Galileo® Systems International in Florida and (as may be directed) to Galileo® Systems International Florida-via-Texas or vice versa on a regular and timely basis, as outlined in the Galileo® Management Mentoring Program materials. Dr. Ness further agrees to schedule and attend long-distance consultations with the GSI Offices in Florida and Texas.

**Cooperation**, for purposes of enrollment and admission in the Management Mentoring Program is further defined as follows:

Dr. Ness specifically acknowledges his understanding that the enrollment requirements of the Galileo® Management Mentoring program includes his agreement to the following:

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

**1]** that he go through the Galileo® Management Mentoring curriculum under the direct supervision of the Galileo® Management Mentoring Training Division.

**2]** that he has been informed by Galileo® Systems International that GSI refuses to either offer the Management Mentoring Program to or enroll prospective students in the Management Mentoring Program should they indicate or suggest in discussions prior to admission that they do not plan to go through the Galileo® Management Mentoring curriculum under the direct supervision of the Galileo® Management Mentoring Training Division.

3] that his enrollment in the Galileo® Management Mentoring Program is indeed dependent upon his making the exact commitment that he will go through the Galileo® Management Mentoring curriculum under the direct supervision of the Galileo® Management Mentoring Training Division.  This commitment is asserted by the fact of Dr. Ness's acceptance of this offer.

4] that he agrees that if any scheduling difficulties should occur, Dr. Ness will follow the precise procedures described in the Galileo® Management Mentoring materials for reaching the Galileo® Systems International Chief Systems Architect and Director of Admissions, Peter Letterese <u>directly and as soon as practical</u> to resolve the problem, if all else fails.

Copyright © 2002. Galileo® Systems International.  All Rights Reserved.

# 5. Payment of the fee shall only be accepted by PL&A/GSI based upon the mutual understandings that:

1] This contract is the only offer being made by GSI, except as may be noted and mutually initialed by both parties.

2] GSI expects its clients to pay in a timely manner, by draft depositable in PL&A's bank in Florida on time and exactly as per this Contract.

3] This contract shall be binding upon the parties upon execution.

4] The client is obligated to pay in full immediately upon execution and it shall be a condition precedent to the delivery of all trademarked and copyrighted goods, etc. by PL&A, Inc. to the client.



5] Failure of any party to comply as stated herein will be deemed a material breach of this contract by that party.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# 6. Governing Law: - This contract shall be governed by Florida law and shall be construed in accordance with Florida law.

# 7. Self-Determined Choice To Purchase:

Any new party replacing a party to this agreement, for whatever reason, shall both benefit and be bound by this agreement as though they were the original signatory. All words in the present tense includes the future; the masculine includes the feminine and neuter; the singular number includes the plural and the plural number includes the singular; and the word "person" includes a corporation as well as a natural person.

Dr. Ness asserts and warrants by affixing his signature below that:

1] He is entering into this agreement ...

2] with questions asked and answered complete to his satisfaction, regarding the issues involved in enrollment in and acceptance by GSI for the Galileo® Management Mentoring Program™.

3] And also that he asserts and warrants by affixing his signature below that he is under no duress nor pressure to enroll whatsoever.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

4] He further warrants that he fully understands that any discount benefit offered below available only <u>within a limited time frame</u> is a free choice of his own to accept or reject in strict accordance with the terms of the contract.

5] **He will be agreeing, by affixing his signature below, to the remedies prescribed within this contract as the sole remedies for the resolution of any and all future disagreements that may arise between the parties.**

6] In view of the fact that the entirety of the negotiations leading to this contract have been conducted by telephone,

   * He acknowledges that he has satisfied himself, as a result of his own questions asked re the Galileo® Management Mentoring Program™ ...

   * as to the desirability of the Galileo® Management Mentoring Program™ for his use.

   In short, Dr. Ness makes this agreement comfortably, willingly and eagerly anticipating the benefits obtainable from the Galileo® Management Mentoring Program™.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# 8. In Case of a Dispute - Alternative Dispute Provisions:

a. **SERVICE OF PROCESS**.  The parties agree that service of process for any dispute arising under this agreement can be made by any authorized process server in the state where the process is served.  Each party waives any objection to jurisdiction over the person being asserted in a court in Broward County, Florida.

b. **ARBITRATION**.  If a dispute arises under this contract either party herein agrees, AS ITS SINGLE SOURCE OF DISPUTE RESOLUTION, <u>to have the dispute arbitrated</u> under the rules of the American Arbitration Association, except as otherwise provided in this paragraph.  Venue for the arbitration shall be in Broward County, Florida but arbitration can be attended by Dr. Ness BY PHONE if a dispute resolution becomes necessary, making a physical trip to Florida unnecessary but available if Dr. Ness were to feel his best interests served by such.

Dr. Ness acknowledges by his signature below that he recognizes and accepts the purposes for PL&A selecting arbitration as the sole and binding dispute resolution option to be:

1) to reduce costs to the client if a dispute cannot be resolved directly with the Galileo® Management Mentoring Program™;

Copyright © 2002. Galileo® Systems International.  All Rights Reserved.

2) to eliminate the absolute need for the client to retain an attorney to be substantially represented in any dispute resolution process yet making the retaining of one where desired, far less expensive to the client and the Galileo® Management Mentoring Program;

3) to speed up justice;

4) to make the contract as a whole perform more smoothly by virtue of taking into account a fair and orderly handling for any worst case scenario. The Commercial Arbitration Rules in force at the time arbitration is requested shall govern the proceeding, except as follows:

      i. The AAA shall not have the power to change the venue as prescribed in this agreement.

      ii. Each of the parties shall designate an arbitrator who shall be actively practicing his business or profession and shall have a minimum of ten years experience in the business or profession. The two arbitrators thus selected shall select a third arbitrator who shall have the same qualifications. The three arbitrators thus selected shall constitute the panel of arbitrators. A decision in the arbitration shall be by a majority vote of the arbitrators.

      iii. The arbitrators shall follow Florida law in determining the arbitration.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

iv. In the award the arbitrators shall specify the facts as found by them; the grounds for their decision; and their conclusions on the law applicable to the decision.

v. Except as otherwise provided in this paragraph, Chapter 682 Florida Statutes shall apply to the arbitration.

vi. Evidence by affidavit shall not be accepted. Chapter 90 Florida Statutes shall apply to the admission and rejection of evidence.

**If a party attempts to contest, modify or circumvent this paragraph, the other party shall be entitled to attorney fees and all expenses reasonably incurred in enforcing this paragraph. The parties agree that any and all disputes of any kind by and between these parties shall be resolved exclusively by arbitration. This shall include any contract disputes, tort disputes, or claims of any kind.**

c. **JURY WAIVER**. THE PARTIES TO THIS AGREEMENT WAIVE ANY RIGHT TO A JURY TRIAL THAT EITHER OF THEM MAY HAVE IN ANY ACTION OR PROCEEDING ARISING FROM OR CONNECTED WITH THIS AGREEMENT. This Agreement contains the entire understanding between the parties.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# Special Terms:
## Money-Back Guarantee:

A money-back guarantee is available for the Ness Practice, if Dr. Ness purchases the Galileo® Management Mentoring Program™ on an immediate basis. Program includes 2-Days In-Office Initial Training scheduled by the Program Mentoring Coordinator.

At the conclusion of two years on the program, should Dr. Ness not be satisfied with the Galileo® Management Mentoring Program™, HE MAY RECEIVE A FULL REFUND IN CASH of the Galileo® Management Mentoring Program™ fee amount paid, as follows: **IF HE DOES NOT FEEL HE HAS GAINED SUFFICIENT TIME AND INCOME FROM THE PROGRAM AT THE END OF TWO YEARS AND HAS COMPLIED WITH THE TERMS OF THIS CONTRACT AS STATED ABOVE IN DETAIL, HE MAY RECEIVE A FULL REFUND.**

**[NOTE: THIS MANAGEMENT MENTORING PROGRAM IS SPECIFICALLY DESIGNED TO ADDRESS PREVIOUS DIFFICULTY A STUDENT MAY HAVE HAD IN STUDYING CASE PRESENTATION AND RELATED CASE MANAGEMENT TOPICS.**

AS **USED IN THIS PARAGRAPH, "COMPLIED WITH THE TERMS OF THIS CONTRACT" MEANS THAT A GOOD FAITH, CONSISTENT AND PERSISTENT EFFORT IS MADE BY THE DOCTOR TO UTILIZE ALL THE PARTS OF THE PROGRAM.**

BY AFFIXING SIGNATURES BELOW, BOTH PARTIES ACKNOWLEDGE THAT THE ABOVE PARAGRAPH IS ONE OF THE CONCEPTUAL BASES FOR THE AGREEMENT.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# Discounts, Fees and Terms:

Payment Schedule: $120,000(US) discounted to $90,000(US) in full, in advance, if Dr. Ness purchases The Galileo® Management Mentoring Program™ **on an immediate basis**. PL&A, Inc. agrees to help Dr. Ness as needed to find a source of funds. Dr. Ness acknowledges that as a result of his signature below, he is authorizing PL&A, Inc., **if his own financial resources make it impossible for him to use such to fund this program in full immediately,** to invest its time and to make available to Dr. Ness its goodwill business relationship with a qualified lender and that he fully agrees to consummate the loan obtained, once approved.

Dr. Ness acknowledges that but for his agreement to these points concerning time and effort on PL&A's part in the pursuit of financial assistance for Dr. Ness expressly for his use in funding The Galileo® Management Mentoring Program™, PL&A Inc. would not spend its executive time nor invest its goodwill relationship with one or more finance sources into merely inquiring as to credit availability for Dr. Ness; nor would it spend any time acquiring credit availability for him, independent of or absent his immediate enrollment in The Galileo® Management Mentoring Group™. By his signing of this agreement, Dr. Ness agrees to be explicitly bound to this section of the Agreement, because he understands that PL&A, Inc. relies upon its opportunity to perform as agreed.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

Dr. Ness agrees and acknowledges that PL&A, Inc. incurs major costs at the risk of a fee contingent upon its successful performance in the acquisition of financing for Dr. Ness.

Further, PL&A, Inc. necessarily limits its commitments and time directed to other potential clients while the financing for Dr. Ness is secured and received by PL&A, Inc., once begun. Once this agreement is signed by Dr. Ness, PL&A, Inc. potentially loses revenue that it would otherwise be able to earn while committed to using its resources to obtain (or assist with the acquisition of) this financing for Dr. Ness.

Because of PL&A, Inc.'s investment and potential revenue loss from other clients while devoting time and resources to the acquisition of Dr. Ness's fee via a financing source(s), Dr. Ness acknowledges and agrees to expeditiously (immediately) acquire and legally sign for (as may be indicated) the funds necessary to pay the full fee for Galileo® Management Mentoring Group™ participation, once identified and located by PL&A, Inc.'s Director of Registration; and to do this at the soonest point after Dr. Ness's signing of this agreement. Dr. Ness additionally acknowledges that PL&A, Inc. expects and Dr. Ness warrants that his decision to pursue and apply assisted financing for Galileo® Management Mentoring™ is firm and final.

Copyright © 2002. Galileo® Systems International. All Rights Reserved.

# CLIENT _____

# DATE _____

# PL&A/GSI          DATE: 15 OCTOBER 2002



Admissions
Director, CEO &
Chief Systems Architect

PLEASE SIGN THIS CONTRACT, AND:
1. MAKE A COPY FOR YOUR RECORDS.
2. FAX BACK RIGHT AWAY THE SIGNED COPY TO 954-434-7152 OR DESIGNATED FAX #.
3. SEND THE ORIGINAL, SIGNED FAX BACK TO PL&A/GSI BY FIRST CLASS MAIL.



Copyright © 2002. Galileo® Systems International.  All Rights Reserved.

GALILEO® SYSTEMS INTERNATIONAL
4919 SW 148 Ave * Davie, FL 33330
Tel: 954-434-4568 * Fax: 954-434-7152
Email: info@galileotraining.com

Galileo® Advanced Management
Mentoring 2003 5-Year Program™



# ADVANCED MANAGEMENT
# MENTORING 2003 5-Year
# STANDARD CONTRACT
### (Including Money-Back Guarantee)

| | |
|---|---|
| Practice | SCHWARTZ DENTAL PRACTICE |
| Address | 1600 El Camino Real, Suite A |
| | Belmont, CA 94002 |
| Principal | Dr. Marc A. Schwartz |

---

# 1. Program Purpose:

Galileo® Systems International (GSI) delivers The Galileo® Advanced Management Mentoring Program™ to Dentists desirous of extraordinary practice improvement. Specific to Dr. Schwartz, this Management Mentoring Program is intended to directly increase, enhance and stabilize Dr. Schwartz's knowledge, responsibility and control with respect to his Dental Practice.

> Please Note: This Agreement has been specifically typeset in larger print to make it easier to read and understand. This typesetting accommodation by necessity increases the number of physical pages of the Agreement. Additionally, an effort has been made to use simple English wherever possible and to eliminate and avoid confusing legal language. It is an element of GSI Enrollment Policy that an authorized representative review this Agreement on first reading by the Applicant to ensure clarity to the greatest degree possible.

*Fh (signature)*

# 2. Program Orientation:

Galileo® Advanced Management Mentoring fees are non-refundable except in the case of Galileo® Systems International's complete refusal to perform simultaneously <u>accompanied by</u> non-performance by Galileo® Systems International. Galileo® Advanced Management Mentoring is not responsible for client failure to provide required cooperation or application of materials.

This fee non-refundability clause is specially amended for Dr. Schwartz, but strictly according to the SPECIAL TERMS near the end of this contract document.  It is herein asserted by both Dr. Schwartz and Galileo® Systems International that they are creating this agreement with every intention that it be <u>successfully</u> consummated and <u>not</u> result in a refund request under its exact terms, but instead result in services rendered which are considered by Dr. Schwartz equal to or greater in value than the fee paid.  Both parties, by entering into this agreement, assert that they do so knowingly and in good faith.

Copyright © 2003. Galileo® Systems International.  All Rights Reserved.

# 3. Advanced Management Mentoring Components & Parameters (Daily/Weekly Contact) ...

## Galileo® Systems International Advanced Management & Mentoring For Five (5) Calendar Years Includes:

**1.** Creating & Maintaining a Maximally Insurance-Independent Dental Practice
**2.** Strategic Performance-Improvement Training™
**3.** Perfect Application of The Technology of Selling®)



# 4. Client Cooperation

is required so that Galileo® Advanced Management Mentoring can obtain the best possible results in the quickest amount of time, so that no time is wasted by either side.

**Cooperation** regarding receipt of services is herein defined in intentionally simple, straightforward terms:

Copyright © 2003. Galileo® Systems International. All Rights Reserved.

1) The client taking reasonable steps to clarify any and all Advanced Management Mentoring provided,

2) The client making reasonable efforts to follow all instructions, once clarified,

3) The client honestly communicating to Galileo® Systems International in Florida any and all difficulties that may arise while making the effort to learn the material taught; and

4) The client attending training sessions which shall be scheduled to the greatest degree possible so as to not interrupt the client's work or personal schedule.

5) Galileo® Advanced Management Mentoring expects its clients to collect and forward data required in a timely manner and Dr. Schwartz hereby agrees to collect the data required and deliver it by fax and e-mail to Galileo® Systems International in Florida on a regular and timely basis, as outlined in the Galileo® Advanced Management Mentoring Program materials. Dr. Schwartz further agrees to schedule and attend long-distance consultations with the GSI Offices in Florida.

**Cooperation**, for purposes of enrollment and admission in the Management Mentoring Program is further defined as follows: Dr. Schwartz herein specifically acknowledges his understanding that the enrollment requirements of the Galileo® Advanced Management Mentoring program includes his agreement to the following:

Copyright © 2003. Galileo® Systems International.  All Rights Reserved.

**1]** That he go through the Galileo® Advanced Management Mentoring curriculum under the direct supervision of the Galileo® Advanced Management Mentoring Training Division.

**2]** That he has been informed by Galileo® Systems International that GSI refuses to either offer the Advanced Management Mentoring Program to or enroll prospective students in the Advanced Management Mentoring Program should they indicate or suggest in discussions prior to admission that they do not plan to go through the Galileo® Advanced Management Mentoring curriculum under the direct supervision of the Galileo® Advanced Management Mentoring Training Division.

3] That his enrollment in the Galileo® Advanced Management Mentoring Program is indeed dependent upon his making the exact commitment that he will go through the Galileo® Advanced Management Mentoring curriculum under the direct supervision of the Galileo® Advanced Management Mentoring Training Division. This commitment is asserted by the fact of Dr. Schwartz's acceptance of this offer.

4] That he agrees that if any scheduling difficulties should occur, Dr. Schwartz will follow the precise procedures described in the Galileo® Advanced Management Mentoring materials for reaching the Galileo® Systems International CEO, Chief Systems Architect and Director of Admissions, Peter Letterese directly, as soon as practical to resolve the problem, should all other means fail.

Copyright © 2003. Galileo® Systems International. All Rights Reserved.