**TAB 4**

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PETER LETTERESE AND ASSOCIATES, INC., et al., <br><br> Cross-defendants and Appellants, <br><br> v. <br><br> BRIDGE PUBLICATIONS, INC., et al., <br><br> Cross-complainants and Respondents. | B179442 <br><br> (Los Angeles County Super. Ct. No. PC034730) <br><br> COURT OF APPEAL - SECOND DIST. <br> F I L E D <br> FEB 2 7 2006 <br> JOSEPH A. LANE     Clerk <br> _____ Deputy Clerk |

APPEAL from orders of the Superior Court of Los Angeles County. Judith Chirlin, Judge. Affirmed.

Law Office of David L. Hoffman and David L. Hoffman for Cross-defendants and Appellants.

Moxon & Kobrin, Ava M. Paquette, Helena K. Kobrin, and Kendrick L. Moxon for Cross-complainant and Respondent Church of Scientology International; Gary S. Soter for Cross-complainant and Respondent Bridge Publications, Inc.

Cross-defendants Peter Letterese and Peter Letterese and Associates, Inc. (PLA), appeal from the orders denying their motions to strike the cross-complaints of Church of Scientology International and Bridge Publications, Inc., on the ground that the cross-complaints were Strategic Litigation Against Public Participation (SLAPP) actions. (Code Civ. Proc., § 425.16.) They also appeal from an order awarding costs to the Church and to Bridge Publications after PLA dismissed its complaint without prejudice. We affirm those orders.

## FACTS AND PROCEDURAL HISTORY

Peter D. Letterese is the president of PLA which held the rights to various sales techniques publications that were authored by the late Les Dane and which were owned by Dane's widow (Dane). PLA sued Bridge Publications, Inc. (Bridge), which is affiliated with the Church of Scientology International (CSI), alleging that Bridge was interfering with the contract between PLA and Dane by attempting to negotiate with Dane for the right to use Dane's sales materials.[1] (L.A. Super. Ct. No. BC 295950.) Bridge cross-complained against PLA and Letterese, seeking declaratory relief that its actions were privileged.[2]

On March 2, 2004, the trial court in the underlying action was scheduled to hear Bridge's motion for terminating and monetary sanctions based on PLA's violation of orders that it appear for depositions. About two weeks before that hearing, the parties began negotiating an agreement that would stop the action for one year, giving them the chance to settle their dispute. Lawyer Richard Marcus represented both Letterese and PLA. On February 25, 2004, Marcus faxed a letter to lawyer David Schindler, who

---

[1]  We will sometimes refer to Letterese and PLA collectively as appellants and will sometimes refer to CSI and Bridge collectively as respondents.

[2]  We will refer to PLA's complaint and Bridge's cross-complaint in case number BC 295950 as the underlying action.

2

represented Bridge and CSI. Marcus's letter said: "This shall confirm the points of our agreement: [¶] 1. Letterese v. Bridge and cross action will be dismissed without prejudice; [¶] 2. Bridge and all C of S [Church of Scientology] related entities will stay away from Danes for 1 year; [¶] 3. Parties agree to negotiate in good faith for 1 year. You and I will have at least six (6) in person meetings. Our first meeting will occur within the next two weeks. [¶] 4. With the exception of [a related arbitration], there shall be no litigation or legal action of any kind for one year. The parties shall not 'go public' regarding this dispute during the one year period. [¶] 5. The statute of limitations on all claims shall be tolled for 1 year. Letterese is not waiving any claims of infringement during this one year moratorium. [¶] If this does not accurately reflect your understanding, please let me know immediately. Thank you."

Schindler responded with a February 27, 2004, letter that fleshed out the terms of Marcus's letter. Schindler's letter began by stating that it would "confirm the terms of the agreement the parties reached Wednesday," and asked Marcus to review and sign the letter. Schindler then set out six provisions of the agreement: "1. The pending litigation in Superior Court in California, Letterese v. Bridge Publications, will be dismissed without prejudice. The cross-complaint will also be dismissed without prejudice. You will work with Mr. [Gary] Soter, [another lawyer representing Bridge,] to prepare the appropriate stipulation to have that lawsuit dismissed. In the event that litigation were to recommence, the parties agree to refile in the Superior Court in California. [¶] 2. The parties, including any entity affiliated with Mr. Letterese and any entity affiliated with the Church of Scientology, agree to refrain from filing any litigation or other legal action against each other in any jurisdiction for a period of 1 year from the date of this Agreement (the 'stand still period'), with the exception of the pending arbitration . . . . [¶] 3. During the stand still period, no representative of the Church of Scientology or any affiliated entity shall attempt to contact any member of the Dane family. [¶] 4. The statute of limitations on any claims either party may have as against the other shall be tolled during the pendency of the stand still period. Neither party waives any claims or defenses that he/it may have against the other by virtue of agreeing to this stand still

3

agreement and nothing in this paragraph shall be construed to operate as a bar or waiver of any defense that either party may have as against the other. [¶] 5. During the pendency of the stand still period, neither party shall make public comments about the other pertaining to any dispute that has arisen between the parties over the use of books written by Les Dane. [¶] 6. During the stand still period, the parties agree to continue negotiating in good faith. To that end, I have agreed to participate in at least six (6) meetings with you (assuming we are unable to resolve matters in fewer than 6 meetings) and I have further agreed that the first meeting shall take place within two (2) weeks of the date of this Agreement. [¶] I trust the preceding accurately summarizes the terms we discussed. If you have any questions, please do not hesitate to contact me. Otherwise, please sign where indicated below." On February 27, 2004, Marcus signed the letter, immediately below a statement that he had "read the foregoing 2 page letter Agreement and agree that it accurately reflects the Agreement between the parties."

    The complaint and cross-complaint in the underlying action were dismissed and Bridge took its sanctions motion off calendar. On March 4, 2004, Marcus sent a letter to Schindler stating that, in confirmation of their February 27, 2004, phone conversation, Marcus asked Schindler to have the letter agreement signed by authorized representatives of all of the Scientology-related entities, including, at a minimum, 16 entities identified in the letter. This set off an exchange of letters between the two in which Marcus continued to press for the signatures of numerous Scientology-related entities while Schindler repeatedly assured Marcus that Schindler had been authorized to conduct negotiations on behalf of Scientology-affiliated entities and asked Marcus to begin negotiating, as per their agreement.

    On April 8, 2004, PLA sued 710 Doe organizations in a complaint for declaratory relief, seeking to determine whether the signatures of various Scientology-related entities were required in order to make the stand still agreement binding. Doe amendments

4

naming Bridge and CSI as defendants were later filed along with the complaint.[3] Bridge and CSI responded with separate cross-complaints against both Letterese and PLA. Bridge's cross-complaint stated two causes of action. The first was for breach of the stand still agreement, based on PLA's conduct in filing the declaratory relief action and in refusing to negotiate the disputes at issue in the underlying action. The second cause of action was for promissory fraud, alleging that PLA and Letterese never intended to honor the stand still agreement at the time it was executed. CSI's cross-complaint alleged breach of the stand still agreement and sought both money damages and a decree of specific performance.

Letterese and PLA then brought separate motions to strike the CSI and Bridge cross-complaints, contending that they violated Code of Civil Procedure section 425.16 (section 425.16), the anti-SLAPP provision, because they had a chilling effect on appellants' First Amendment rights to petition by way of bringing a lawsuit. Appellants' first anti-SLAPP motion, against Bridge, was denied on November 12, 2004. Four days later, after CSI obtained orders from the court authorizing the depositions of Letterese and members of the Dane family, PLA dismissed its declaratory relief complaint. That same day, PLA filed its second anti-SLAPP motion, against CSI. That motion was also denied. After entry of PLA's dismissal of its complaint, Bridge and CSI sought and were awarded statutory costs of, respectively, $2,954.44 and $1,680.74. On appeal, Letterese and PLA contend that the trial court erred by denying their two anti-SLAPP motions and by awarding Bridge and CSI their statutory costs.[4]

On appeal, appellants contend: (1) respondents cannot prevail on the merits of their claims because there was no meeting of minds as to who was required to sign the stand still agreement; (2) the litigation privilege (Civ. Code, § 47, subd. (b)) bars

---

[3] Another Scientology affiliate—World Institute of Scientology Enterprises, Inc. (WISE)—was also named as a Doe defendant. WISE is not a party to this appeal.

[4] The two anti-SLAPP motions were virtually identical to each other, as were the opposition briefs to those motions. For ease of reference, we therefore treat them analytically as one motion.

respondents' fraud and breach of contract claims; (3) Bridge cannot prevail on the merits of its fraud claim because there is no evidence appellants did not intend to honor the stand still agreement; (4) Bridge cannot prevail on the merits because it cannot show any damages from appellants' conduct; (5) the trial court did not perform the required analysis for an anti-SLAPP motion; and (6) the trial court's award of statutory costs was premature because respondents' cross-complaints were still pending.

## DISCUSSION

1. *Standards Applicable to anti-SLAPP Motions*

Section 425.16, subdivision (b)(1) provides that "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." The statute defines an act in furtherance of the rights of free speech or petition to include, among others, "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; [and] (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law . . . ." (§ 425.16, subd. (e).)

Evaluating an anti-SLAPP motion is a two-step process. First, the trial court decides whether the defendant has made a threshold showing that the challenged cause of action arises from protected activity. A defendant meets this burden by showing that the conduct upon which the plaintiff's claim is based fits one of the categories spelled out in section 425.16, subdivision (e). The defendant does not have to show that the plaintiff subjectively intended to chill the defendant's protected rights or that the action has any chilling effect. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) If the court finds that the defendant's alleged conduct qualifies for anti-SLAPP protection, it proceeds to the second step: determining whether the plaintiff has demonstrated a

6

probability of prevailing on the claim. In order to do so, the plaintiff need only show that his complaint is legally sufficient and is supported by a prima facie showing of facts which, if believed by a trier of fact, would be enough to sustain a judgment in his favor. (*Id.* at pp. 88-89.) A plaintiff's burden on the second prong of an anti-SLAPP motion is therefore similar to that of a party opposing summary judgment. The same rules apply to cross-complaints (§ 425.16, subd. (h).) (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 768 (*Navellier II*).) We review the trial court's ruling de novo. (*Ibid.*)[5]

2. *Objective Evidence of Mutual Assent Supports the Stand Still Agreement*

A fundamental prerequisite to a valid contract is mutual assent by the parties to the essential terms of the purported agreement. (Civ. Code, § 1550; *Merced County Sheriff's Employees' Assn. v. County of Merced* (1987) 188 Cal.App.3d 662, 670 (*Merced County*).) Appellants contend that because Letterese believed the signatures of all Scientology-related entities were required by the terms of the stand still agreement, while respondents believed otherwise, the agreement lacked mutual assent and is therefore unenforceable. Accordingly, they conclude, respondents cannot show a probability of prevailing on the merits of their contract or promissory fraud claims and the anti-SLAPP motion should have been granted.

Mutual assent turns on objective criteria, such as the parties' words and conduct, and not on their unexpressed, subjective belief or intent. (*Merced County, supra,* 188 Cal.App.3d at p. 670; *Zurich etc. Assur. Co. v. Indus. Acc. Com.* (1933) 132 Cal.App. 101, 103-104.) Appellants never discuss this standard, and rely solely on the declaration of Letterese that he believed the signatures of numerous other Scientology-related entities were necessary to make the stand still agreement binding. Because respondents have neither cited authority concerning the objective standard of mutual assent, nor discussed

---

[5] Respondents concede that the first prong of the SLAPP test was satisfied, leaving at issue the second prong only: whether respondents have shown a probability of prevailing on the merits.

7

the issue, we deem it waived. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700.)

We alternatively hold on the merits that respondents produced sufficient evidence on the issue of mutual assent. Letterese said in his declaration that he believed he would be entering an agreement "with all entities affiliated with the Church of Scientology." He based his belief on "a conversation that [he] had with David Schindler that he was representing all entities affiliated with the Church of Scientology." Letterese said PLA was having a dispute "with these entities" over the rights to Les Dane's books "and part of the proposed agreement was the tolling of the statute of limitations and an agreement by all the entities affiliated with the Church of Scientology not to contact the Danes." Letterese said that PLA needed all of those entities to be part of the agreement, and believed they would be bound "based upon specific representations made by Mr. Schindler to me and my attorneys during settlement negotiations . . . ." This provision was manifested by Marcus's February 25 letter to Schindler, which stated that Bridge and all Church of Scientology related entities would stay away from the Danes for one year. Marcus signed Schindler's February 27, 2004, letter "to effectuate a dismissal of the case," and because they believed they were entering an agreement with all entities related to CSI. Finally, Letterese contends that Marcus's March 4, 2004, letter to Schindler confirmed that all Scientology entities were to sign the agreement.

There are several weak links in this chain of evidence. First, while Letterese refers to certain specific statements by Schindler concerning the signatures requirement, Letterese never identifies those statements. Second, Marcus's March 4 letter simply states that, "[c]onfirming our telephone conversation of 2/27/04, I ask that you please provide me with a copy of our letter agreement executed by" numerous Scientology-related entities. This is not a statement that the stand still agreement required the signatures of all Scientology-related entities to become effective. It is ambiguous at best, and could easily be read to mean that Marcus was merely confirming a post-agreement request for such signatures, not that Schindler was confirming that he was contractually required to obtain them. Furthermore, absent from the anti-SLAPP motions was a

8

declaration from Marcus explaining what he meant in that letter or otherwise attesting to either his or Letterese's understanding of events.

In contrast, Schindler pointed to the fact that neither Marcus's February 25 draft, nor Schindler's February 27 version, made any reference to obtaining the signatures of non-party entities. Marcus signed the February 27 version, acknowledging that it reflected the parties' agreement. Soon after, the parties performed an essential term of the stand still agreement and dismissed their pleadings. According to Schindler, it was only after he and Marcus signed the agreement and dismissed the complaint and cross-complaint that Marcus demanded that all Scientology related entities sign the stand still agreement. When Schindler first came into the case in January 2004, he told Marcus that he had been retained by CSI, which he described as the "mother church," as well as by WISE and Bridge. After Marcus made his demands for additional signatures, Schindler reminded him of that fact and repeatedly assured Marcus that he was authorized to negotiate on behalf of the entities affiliated with CSI.

Viewing this evidence under the reverse summary judgment standard of review applicable to anti-SLAPP motions, and under the objective standard applicable to questions of mutual assent, we believe respondents raised triable issues of fact that there was mutual assent to the stand still agreement. PLA's underlying action was against only Bridge, not the potentially hundreds of other Scientology-related entities that appellants contend were required to sign the stand still agreement. The stand still agreement made no mention of obtaining such signatures, but did include a promise that all Scientology-related entities would refrain from contacting the Danes. CSI, which was the "mother church" of Scientology, authorized Schindler to negotiate the stand still agreement and presumably had authority over its own affiliated entities. Therefore, the stand still agreement did not necessarily require the signatures of authorized representatives from hundreds of such affiliates in order to make that promise effective. Finally, by dismissing the pleadings in the underlying action, all parties began to perform under the stand still agreement once Marcus signed it on behalf of appellants. Such conduct, together with

9

the evidence described above, leads to an inference that the agreement was final and enforceable at that time.

3. *The Litigation Privilege Does Not Apply*

Under Civil Code section 47, subdivision (b), communications made in connection with judicial proceedings are absolutely privileged. Appellants contend that their declaratory relief action came within that privilege, meaning that respondents' contract and fraud claims had no probability of prevailing on the merits for purposes of their anti-SLAPP motions.

In *Navellier, supra,* 29 Cal.4th 82, the plaintiffs alleged that the defendants had breached the terms of a release by bringing a new action, and also alleged that the defendants committed promissory fraud when they executed the release. The defendant brought an anti-SLAPP motion, contending that the plaintiffs were infringing his right to petition by way of the new action. The court clarified that the plaintiffs' lawsuit was part of First Amendment petition activity that satisfied the first prong of section 425.16. The Supreme Court remanded so the appellate court could consider the second prong of an anti-SLAPP motion—whether the plaintiffs had shown a probability of prevailing on the merits. Even though the *Navellier* court did not reach the second prong issue, it said that a defendant who had contracted away his right to sue could not prevail on an anti-SLAPP motion if the plaintiff could show a probability of prevailing on the merits of a claim for breach of that contract. (*Id.* at pp. 93-94.) On remand to the court of appeal to determine whether the plaintiff had shown a probability of prevailing on the merits, the appellate court assumed that the litigation privilege would not apply to bar an action brought for breach of an agreement not to file suit if the plaintiff could show a probability of prevailing on the merits. (*Navellier II, supra,* 106 Cal.App.4th at pp. 773-774.) Because the plaintiffs had not shown any damages from the alleged breach of contract, however, the appellate court reversed the order denying the anti-SLAPP motion. Finally, in *Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1493-1494, the court held that the litigation privilege did not apply to bar a cause of action for breach of a contract to refrain

from making negative comments about the plaintiff. Based on these authorities, we conclude that the litigation privilege does not bar respondents' breach of contract causes of action, which arise from a stand still agreement prohibiting litigation between the parties about their dispute in the underlying action.

Even though the court in *Navellier II* held that a meritorious action for breach of a contract not to sue was outside the scope of the litigation privilege, it also held that an action for promissory fraud based on allegations that the defendant never intended to honor the agreement when it was signed was still barred by that privilege. (*Navellier II, supra,* 106 Cal.App.4th at pp. 770-772.) Respondents contend that PLA's declaratory relief action is simply evidence of a tortious course of conduct by appellants and that appellants' fraud liability is therefore not truly premised on PLA's complaint. (See *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 888.) We need not resolve that issue, however. PLA's declaratory relief action supplies only half the basis for Bridge's fraud claim. The other half is based on appellants' alleged failure to negotiate in good faith to resolve the dispute in the underlying action. Appellants do not contend, and we are aware of no authority which holds, that the litigation privilege applies to promissory fraud based on breach of an agreement to negotiate. Even if Bridge's fraud claim is barred, that bar extends no further than PLA's declaratory relief action. Accordingly, Bridge's fraud cause of action appears meritorious.

4. *Evidence of Fraudulent Intent*

An essential element of a claim for promissory fraud is evidence that the defendant never intended to honor the disputed contract. Proof that a promise made was not fulfilled, standing alone, is insufficient to prove this type of fraud. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30.) Appellants contend in the introductory portion of their brief that Bridge lacks any evidence of their fraudulent intent, therefore dooming its promissory fraud claim. We reject this contention for two reasons. First, it is unsupported by discussion or citation to authority. (*Landry v. Berryessa Union School Dist., supra,* 39 Cal.App.4th at pp. 699-700.) Second, proof of fraudulent intent most

often depends upon circumstantial evidence, such as a defendant's hasty repudiation of his promise or his failure to even attempt performance. (*Tenzer v. Superscope, Inc., supra,* at p. 30.) If respondents' evidence is believed, it shows that the additional signatures requirement advanced by appellants was never part of the stand still agreement, that as soon as the parties dismissed their pleadings and respondents withdrew their pending sanctions motion, appellants began to assert the signature issue as a basis for non-performance, and that appellants thereafter refused to negotiate, as required by the agreement. On these facts, we believe an inference can be drawn that appellants never intended to perform the stand still agreement.

5. *Evidence of Damages*

As part of their discussion on the litigation privilege, appellants argue that Bridge "had to show damages. However, Bridge showed no cognizable damages. It only alleged attorney's fees and costs which are not sufficient to maintain these causes of action." Appellants do not point us to the portions of the record where these matters were raised, do not set forth the facts and arguments raised below on this point, do not cite to authority for their appellate argument, and have not stated this point under a separate heading or subheading. (Cal. Rules of Court, rule 14(a)(1)(B).)[6] We therefore deem the issue waived.

We alternatively conclude that, at this point in the proceedings, respondents have shown the existence of a legal remedy. First, to the extent CSI seeks specific performance of the standstill agreement as a remedy for appellants' breach, no proof of damages is needed to sustain the cause of action. (See *BD Inns v. Pooley* (1990) 218 Cal.App.3d 289, 298.) Second, it is arguable that respondents' attorney's fees and costs for defending appellants' declaratory relief action and for bringing their own cross complaints fall outside the rule prohibiting recovery of those fees absent an express provision to that effect in their agreement. (Code Civ. Proc., § 1021.) Avoiding such

---

[6]     All further rule references are to the California Rules of Court.

fees was an express purpose of the standstill agreement and it was reasonably foreseeable that such fees would be incurred as the result of appellants' alleged breach. (Civ. Code, § 3333; *Anchor Motor Freight v. Intern. Broth. of Teamsters* (6th Cir. 1983) 700 F.2d 1067, 1072 [attorney's fees recoverable for breach of covenant not to sue because they were not fees to the prevailing party but were instead the subject of the action itself].) Finally, even if respondents are not entitled to their litigation fees,[7] it appears that they incurred attorney's fees in connection with negotiating and drafting the standstill agreement and in connection with their pre-litigation contacts with appellants' counsel concerning that agreement.

6. *The Court Conducted the Required Analysis.*

Appellants contend that the "trial court ruling provided no rationale for its denial of the [anti-SLAPP motions]." They base this brief contention on a citation to pages 19 through 21 of the transcript from the hearing on the November 12, 2004, anti-SLAPP motion against Bridge. They also cite to *Navellier, supra,* 29 Cal.4th 82, contending that the "case law is clear." Frankly, we believe this argument borders on the unintelligible and therefore deem it waived. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 785-765 [requirement of "reasoned argument"].) To the extent appellants contend the trial court was required to state the reasons for its ruling on an anti-SLAPP motion, the issue is waived because *Navellier* does not address that issue and because they have cited no authority for the proposition. Even if such a requirement existed, because we exercise independent review of a trial court's ruling, we believe the error would be harmless. Finally, our review of the November 12 transcript shows that the trial court reached both prongs of section 425.16, when it began the hearing by stating that PLA's declaratory

---

7   That is an issue we do not decide.

13

relief action was protected by that section, but indicated that respondents had shown a probability of prevailing on the merits.[8]

### 7. *The Trial Court Properly Awarded Costs to Respondents*

After PLA dismissed its declaratory relief action, Bridge and CSI filed separate costs memoranda. On January 12, 2005, Bridge and CSI were awarded statutory costs (Code Civ. Proc., § 1032) of, respectively, $2,954.44 and $1,680.74. Code of Civil Procedure section 1032 (section 1032) states that a prevailing party "is entitled as a matter of right to recover costs in any action or proceeding." (§ 1032, subd. (b).) A prevailing party is one "with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs, who do not recover any relief against that defendant." (§ 1032, subd. (a)(4).) PLA contends that costs should not have been awarded because respondents' cross-complaints were still pending and it was therefore impossible to determine who was the prevailing party. We disagree.

PLA's contention is based on inapplicable authorities: *Great Western Bank v. Converse Consultants, Inc.* (1997) 58 Cal.App.4th 609, which concerned a cross-defendant's right to recover costs as the prevailing party where the cross-complaint was dismissed as part of a good faith settlement—and *Clayton Development Co. v. Falvey* (1988) 206 Cal.App.3d 438, which turned on the right to recover attorney's fees, where a voluntary dismissal expressly *does not* make one a prevailing party. (Civ. Code, § 1717, subd. (b)(2).) Section 1032, on the other hand, states that a party who has been voluntarily dismissed is a prevailing party for purposes of awarding costs. By its express definitional terms, that section also applies to cross-defendants (§ 1032, subds. (a)(1), (2)), but says nothing about the need to first obtain a resolution of a pending complaint. We read this to mean that a cross-defendant who has been voluntarily dismissed is

---

[8] We also note that had there been any merit to appellants' contentions, because appellants cited to only the transcript from the hearing on the motion against Bridge, their argument would have applied to only Bridge.

14

automatically entitled to recover its costs even if a complaint is still pending. The same must also hold true for a defendant who has been voluntarily dismissed but still has a cross-complaint pending.

Under rule 870(1), a prevailing party who claims costs must file a costs memorandum within 15 days from the date the clerk mails notice of entry of the dismissal or the date of service of written notice of entry of the dismissal, or within 180 days from entry of the dismissal, whichever comes first. On November 16, 2004, PLA filed its request for dismissal and served copies of the filed request on respondents. CSI filed its costs memo on December 1, 2004. The copy of Bridge's costs memo included in the record is not file stamped, but is dated November 23, 2004. PLA does not dispute that both memos were filed on time. Instead, PLA contends that a proposed judgment of dismissal was required to be filed within the same deadline set by rule 870. Because a proposed judgment was not filed until December 28, 2004, however, PLA contends costs should not have been awarded.

The only authority PLA cites for this proposition is *Sanabria v. Embrey* (2001) 92 Cal.App.4th 422, which held that a memorandum of costs filed almost six months after service of notice of entry of dismissal was untimely. In dictum, the court cited two practice treatises, stating, "[a]pparently, the memorandum of costs must be filed together with a proposed judgment of dismissal." (*Id.* at p. 426, fn. 2, citing Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶ 11-38, p. 11-21 (Weil & Brown), and 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 270, pp. 689-690 (Witkin).) Witkin does not state that a proposed judgment must be filed along with a timely filed costs memo. Instead, all Witkin says is that a judgment in defendant's favor must be entered in order to recover costs. (Witkin, *supra*, § 270, pp. 689-690.) Although Weil & Brown states that a proposed judgment must "apparently" be filed along with a costs memo, the preceding discussion also focuses on the need to have a judgment of dismissal entered before costs may be awarded. We do not believe that a proposed judgment had to be filed at the same time and under the same deadline as a costs memorandum. We believe instead that it is sufficient if a judgment of

15

dismissal was entered before, or contemporaneously with, an award of statutory costs. The proposed judgment submitted by respondents was signed by the court at the hearing where costs were awarded, and the two costs awards were therefore valid.

## DISPOSITION

For the reasons set forth above, the orders denying the anti-SLAPP motions against Bridge and CSI, and the award of statutory costs to those parties upon entry of the judgment dismissing PLA's complaint, are affirmed. Respondents to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    RUBIN, J.

We concur:


COOPER, P.J.


FLIER, J.